## Ellis Estate

*Benjamin R. Neilson* and *H. Ober Hess*, for exceptant.

*Abraham L. Shapiro* and *Norman C. Henss*, contra.

SAYLOR, J., December 3, 1968.—Herman M. Ellis, one of the five children of decedent, appealed from the probate of her will of October 8, 1961, and three codicils thereto dated respectively December 29, 1961, June 14, 1962, and July 9, 1963. The grounds for the appeal are (1) lack of testamentary capacity and (2) undue influence exercised upon decedent by her two sons, Martin B. Ellis and Sidney H. Ellis, her daughter Ruth, and her husband, Dr. Arthur First, and others named and unnamed.

Hearings on the petition and the answer of respondents were held by Burke, J., who, by opinion and decree entered July 31, 1968, dismissed the appeal and remanded the record to the Register of Wills.

During the hearings the contestant abandoned the first ground of his appeal. He filed exceptions to the opinion and decree, averring error by the trial judge in finding that the record was bare of direct evidence pointing to any of the tenets that can be invoked to void the will on the ground of undue influence, in concluding that the contestant failed to meet the burden of proof imposed upon him, and in not entering a decree sustaining the appeal and setting aside the decree of probate.

While no exception was filed to the refusal of the hearing judge to admit into evidence the records of Graduate Hospital where decedent had been a patient on seven occasions of varying length from March 13, 1961, to her death there on March 2, 1964, contestant's counsel argued before the court en banc that there was error in that refusal.

It had been agreed by counsel that the records in question had been made in the regular course of business at or near the time of the act, condition, or event, and that the records were produced by the custodian or a qualified witness who testified as to their identity in accordance with the provisions of the Uniform Business Records as Evidence Act of May 4, 1939, P. L. 42. However, proponent's counsel did object to the admission of the records because the sources of information, method, and time of preparation, were not such as to justify their admission.

Contestant's counsel has stated that his offer of the hospital records is limited to those pages which have been marked with red pencil. There are 57 such pages in the records of decedent's 7 visits to the hospital. A careful examination of these pages shows that under the headings, "history" and "ward notes", there are facts and events recorded and opinions as well.

With the concurrence of the hearing judge, the marked pages of the hospital records are admitted for the limited purpose of placing on record in this litigation the facts and events set forth therein. Opinions stated on such pages are not admitted in evidence.

As stated by Mr. Justice Cohen in Fauceglia v. Harry, 409 Pa. 155 (1962), at page 162:

"We are dealing with historical facts and not medical opinions and there is therefore no need to ascertain whether the author of these statements was a qualified physician. Since we are not concerned with admitting opinion evidence, proof of the identity of the person 'responsible' for the statements is not required".

Actually, the record in this case contains abundant opinion evidence dehors the hospital records as to the decedent's physical and mental condition while she was hospitalized from the physicians who treated her during this period.

Her physician, Dr. Samuel Bellet, Dr. Arthur Fried, also a physician, and Dr. Paul Sloane, a psychiatrist, all testified for the proponents, and the contestant was free to cross-examine them. Their testimony was substantially in harmony with the hospital record data on facts and events. Their opinions as to decedent's mental state were unchallenged.

It seems clear that decedent had since the early part of 1961 suffered from hypertension, heart disease, atherosclerosis, diabetes mellitus and arthritis. Hence, her several hospitalizations. It seems likewise clear that her mental condition was not adversely affected by these ailments. As a matter of fact, most of these afflictions were "controlled".

The ward notes show that while Mrs. Ellis was a known "cardiac" and a "diabetic", her mental power was not impaired. On June 27, 1962, a note reads "memory and judgment intact"; on February 11, 1963, she was "doing well mentally"; on January 25, 1964, she was "mentally alert"; and on January 28, 1964, she was "mentally clear and coherent". There is in the record of this case no contradiction of these statements. Mrs. Ellis died on March 2, 1964, of "cardiac failure".

True, the hospital records show that Mrs. Ellis was "emotionally labile", had "congestive heart failure and was on occasion depressed". No doubt any woman of 75 would suffer from the ailments afflicting her and while at the hospital for a total of 80 days over a period of 3 years would be depressed and at times while under sedation would be confused. That did not mean that she was incompetent to make a will and three codicils, or that she was so weakened in intellect as to become a victim of those exerting undue influence upon her.

The will was executed over six months after decedent's first hospitalization; her first codicil nearly three months thereafter. Her second codicil was exe-

cuted two months after she left the hospital on April 10, 1962, two months before her third visit. Her third codicil was executed on July 9, 1963, nearly five months after her fifth visit and five months before her death.

It was presumably on these facts and on the testimony of the doctors and others among the dozen or more witnesses called by the proponents that the contestant's counsel withdrew as a ground of his appeal the charge of lack of testamentary capacity.

Nevertheless, because of decedent's illnesses it is argued that there resulted a weakening of body and intellect that made her the victim of undue influence. That ground as a basis of the appeal is pressed by the contestant.

A study of the voluminous record compels the conclusion that the contestant was given more than ample opportunity to prove his claim of undue influence. He himself testified, as did four witnesses in his behalf. The substance of this testimony was that his brothers, sister, brother-in-law and decedent's attorney conspired to poison the mind of his mother against him, and by instructions to her maid and her nurses endeavored to prevent him from seeing his mother. In actual fact, not only was it denied by those charged with practicing undue influence that they had followed this course of action, but there was considerable evidence that any such instructions were not carried out and that the contestant actually saw his mother regularly over a period of years commencing some six months after her will was executed. Actually, the contestant spoke to her on the telephone frequently in spite of his charge that his relatives tried to prevent such conversation. During the interval when Herman did not see his mother, he himself testified that this was due to his decision to stay away as he did not want to excite her. As a matter of fact, de-

cedent told her employe, Mrs. Savage, that it was she who would give orders and that her orders would be followed, not those given by others.

Decedent disinherited her son Herman. In her will she stated:

"Thirteenth. I have given much thought to the making of this will. I am fully aware of the fact that I have bequeathed nothing to my sons. Herman and Edmund (except for the Barrington, New Jersey property to Herman). I also fully realize that I have not appointed my sons, Herman and Edmund, as Executors of my estate. All of this I have done for reasons of my own, some of which are well known to them".

In her first codicil, executed on December 29, 1961, decedent did make provision for Edmund. She changed paragraph Thirteenth of her will to give recognition to the fact that she had made such provision. She repeated reference to the gift of the property at Barrington, New Jersey, to Herman. And she repeated the language of her will:

"All of this I have done for reasons of my own, some of which are well known to them".

In her second codicil of June 14, 1962, and in her third and last codicil of July 9, 1963, no further reference was made to Herman. In all three codicils decedent ratified, confirmed and republished her will of October 8, 1961.

Decedent's "reasons of my own", so far as the record reveals them, are two in number. The first relates to the conduct of her son Herman when on September 16, 1961, at the family gathering in decedent's house the attorney, Sylvan M. Cohen, read the will of Herman's father, Abraham E. Ellis, who had died on September 1, 1961. It was then that Herman learned that while he had been named as an executor his father had treated him differently from his broth-

ers in that the bequest to Herman was in trust while those to the brothers were absolute. Herman threw the company into consternation by shouting charges of various kinds and asserted that his father was insane. As the Ellis family had been closely-knit and there had been deep affection between parents and children, the shock was great. All present at the reading participated in the verbal turmoil, and there was concern for the well-being of the widow who had been suffering for a long time from her heart condition.

Thereafter there was strain in the relationship between Herman and his mother, Rose. There is considerable evidence in the record that the mother pleaded with him not to seek vengeance for the way his father had made his will, and by proper conduct to repair the damage done to the family pride and the memory of a deceased husband whom she dearly loved.

But that was not to be. Instead, Herman further outraged his mother by employing as a lawyer to represent his interests in his father's estate the one member of the bar, out of thousands available in Philadelphia, who had been a thorn in her husband's side. That lawyer, David F. Maxwell, Esquire, a prominent, respected and able member of the bar and formerly a president of the American Bar Association, had been employed not long before by a collateral member of the family in bitter litigation against Herman Ellis' father, Abraham, whose death, his widow believed, had been hastened by the conduct of the attorney in pressing his client's claim against him. Mr. Maxwell's conduct in that litigation was exemplary. But, despite the fact that he had done nothing that was reprehensible in representing his client, because he had been the lawyer for the claimant against Mr. Ellis, his widow considered her son Herman's selection of Mr. Maxwell as his attorney an unpardonable affront to her and to her husband's memory. Nevertheless, de-

spite frequent pleas by his mother and a repetition of such pleas and entreaties by other members of the family not to employ the attorney in question, Herman went ahead and employed him. That this caused unmitigated unhappiness in the family was testified to by many of the proponents' witnesses. Moreover, Herman admitted that his action caused turmoil.

There may have been other reasons which decedent had in mind in disinheriting her son. She executed her will on October 8, 1961, 3 weeks after the scene at the reading of her husband's will and 38 days after his death. Doubtless the unfilial behavior of her son Herman in attacking the revered memory of his father by calling him insane prompted her to do as she did. In employing the very same lawyer who in his father's lifetime had caused him such pain and anguish, Herman had exacerbated that pain. His mother never altered her will to make him a participant in her bounty.

There was no substantial testimony that there existed such a confidential relationship between the decedent and the members of her family as to establish the charge that they exercised undue influence upon her.

In Carson Estate, 431 Pa. 311, it was stated, at pages 318-19:

" . . . the test for determining the existence of a confidential relationship should not be based upon decedent's physical infirmities, but rather should be based upon the extent to which decedent's mental capacity has been impaired as a result of those physical infirmities".

It was not undue influence practiced by members of decedent's family and her lawyer which caused her to disinherit her son; it was his conduct that did so. The mind of decedent was not imprisoned by the children who were loyal and considerate. Herman had access to

her in person and by telephone. It was his conduct respecting his father's memory and his persistence in irritating and displeasing his mother that unquestionably induced her to write her will as she did and to refrain from altering it with respect to Herman during the three years she lived after its execution.

The hearing judge, in carefully reviewing the testimony contained in the voluminous record of this case, reached the conclusion that it is barren of evidence supporting contestant's charge that the probated will and codicils were procured by the exercise of undue influence. He properly did so.

The exceptions are dismissed, and the opinion and decree are confirmed absolutely.